Gregory C. Nuti (CSBN 151754)
Christopher H. Hart (CSBN 184117)
Kevin W. Coleman (CSBN 168538)
NUTI HART LLP
6232 La Salle Ave, Suite D
Oakland, CA 94611
Telephone: 510-506-7152
Email: gnuti@nutihart.com
chart@nutihart.com
kcoleman@nutihart.com

Proposed Attorneys for Bullivant Houser Bailey PC, Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>BULLIVANT HOUSER BAILEY PC<br><br>Debtor. | Case No.: 25-31017 DM<br><br>Chapter 11<br><br>**DECLARATION OF RONALD L. RICHMAN IN SUPPORT OF FIRST DAY MOTIONS**<br><br>Date: December 19, 2025<br>Time: 1:30 p.m.<br>Place: Courtroom 17<br>       450 Golden Gate Avenue, 16th Floor<br>       San Francisco, CA 94102<br>Judge: Hon. Dennis Montali |

I, Ronald L. Richman, hereby declare and state as follows:

1. I am the Chief Dissolution Officer of Bullivant Houser Bailey PC ("BHB" or "Debtor"). I have served in this capacity since September 23, 2025. I joined BHB in April 2002. I became a non-equity shareholder in January 2004 and an equity shareholder in January 2009. I have served as BHB's general counsel from approximately 2016 through 2025. In total, I have practiced law for forty-two years, beginning with my service as a Lieutenant in the US Navy JAGC at the Naval Legal Service Office on Treasure Island, San Francisco, CA from 1985-1988. My practice while at BHB has focused on commercial, contract and general business litigation, real estate litigation and ERISA multi-employer trust fund litigation.

2. I have personal knowledge about the business and financial affairs of BHB and am authorized to submit this declaration in support of the Debtor's "First Day" Motions. Except as otherwise indicated, could and would testify competently to the following if called upon to do so.

**Background**

3. BHB is an Oregon professional corporation that maintained offices in Seattle, Washington, Portland, Oregon, and San Francisco, California. Since joining BHB in April 2002, I have worked out of BHB's San Francisco office. BHB was formed nearly 80 years ago and grew to become one of the largest multi-service regional firms in the Pacific Northwest. For the calendar year ending December 31, 2024, BHB earned $31 million in gross revenue with net income of $629,831 on a cash basis.

4. At the end of 2024, two key shareholders with significant practices, Jeanne Loftis and Samuel Ruby, left BHB. Sam Ruby retired unexpectedly and Jeanne Loftis joined a larger law firm. Jeanne Loftis took a team of lawyers, paralegals and staff to the new law firm. As of January 1, 2025, BHB continued to employ 58 attorneys, including 19 equity shareholders. BHB's board of directors, however, recognized that in the competitive environment for legal talent, it had to explore ways to increase the firm's profitability in order to retain and attract qualified professionals that would allow the firm to continue rendering high-quality services to clients. Consequently, in early 2025, BHB's board of directors hired the consulting firm LawVision to conduct a review of the firm, set priorities, grow the firm, and increase overall profitability.

5. Under the compensation structure that had existed for many years prior, BHB had employment contracts with each of its equity shareholders (and its other non-equity shareholders) that set that individual's salary, and reported salary paid to the shareholders as W-2 income to taxing authorities. Equity shareholders were also entitled to a share of profits of the firm, expense reimbursements and other benefits. No equity shareholder guaranteed any of BHB's debts or was a party to any other agreement that would make him or her liable for general corporate obligations of the firm.

6. On June 30, 2025, one of BHB's equity shareholders, Lloyd Bernstein, moved his practice group, including lawyers, paralegals and staff, to a large national law firm. That group accounted for approximately 17% of BHB's billings for the period January 1 to June 30, 2025. While the departure of the Bernstein group represented a significant percentage of revenue, BHB continued to pay its obligations when due over the summer of 2025. (Columbia Bank had provided the firm with a $3 million line of credit. To manage cash flow, from time to time, BHB drew on the line of credit but typically repaid those draws within the same month the draws were taken. BHB did carry forward balances on the line of credit in amounts ranging from $135,366.28 to -$279,294.05 during the months of May, June, and July 2025, but those carry-forward balances were repaid in full during August 2025.)

7. Mr. Bernstein's departure, however, created challenges for an "internal" growth strategy at BHB, and consequently LawVision's focus shifted to pursue identification of potential merger/acquisition candidates.

8. By August, BHB was in active and substantive merger discussions with an Am Law 200 law firm. Those discussions contemplated acquisition of substantially all of BHB's employees and equity shareholders as well as assumption of the leases for BHB's Seattle, Portland, and San Francisco office space. However, four (4) more equity shareholders announced their departures while merger discussions with this firm were ongoing, ultimately leaving BHB between August 22 and September 5, 2025. The merger candidate nevertheless provided a term sheet that included offers to BHB's remaining equity shareholders, retention of substantially all employees and assumption of the three office leases, but the outlined terms conditioned any merger transaction upon *inter alia* there not being any further reduction in attorney head count.

9. Unfortunately, BHB was not able to satisfy the attorney head count condition because additional equity shareholders gave notice they would not join the merger candidate firm. Merger discussions therefore terminated on September 12, 2025. By that date, BHB had collected over $18.4 million in fees in calendar year 2025. On an accrual basis, the firm

Case: 25-31017    Doc# 11    Filed: 12/15/25    Entered: 12/15/25 17:44:21    Page 3 of 14

experienced a loss of $755,848 through August 31, 2025, but nevertheless remained current on all of its liabilities.

10. Immediately following the termination of merger talks and the new round of departures, BHB's Board of Directors evaluated the economic circumstances of the firm as well as the prospects for and length of time it would take to rebuild the firm. The board concluded that in light of BHB's fixed costs and revenue potential, it was in the best interests of BHB's stakeholders for the firm to dissolve and conduct an orderly winddown.

11. Equity shareholders approved a resolution to dissolve the firm on September 23, 2025. As part of the dissolution resolution, the firm's by-laws were amended to create a new position of Chief Dissolution Officer ("CDO") which was vested with all of the powers of the board of directors and officers. I was appointed to the CDO position, and all board members and officers resigned from their positions. Shortly thereafter, BHB publicly announced its decision to dissolve and to cease providing legal services to clients as of October 31, 2025.

12. BHB continued to generate billings during the month of October, but the rate declined as attorneys and clients transitioned over the course of the month to new law firms. All of BHB's remaining employees were terminated as of October 31, 2025, except for a core group of eight (8) individuals who were necessary to assist with collection of accounts receivable,[1] transfer client files in compliance with applicable state ethics rules, and manage the winddown process. All salary and wage-type obligations (including accrued vacation time) were paid in full to the departing employees at the termination of their employment.

13. Prior to October 31, 2025, BHB negotiated agreements with each of the eight continuing employees to incentivize them to maintain their employment with the firm through the winddown process. (I am one of the eight remaining employees who has entered into a retention agreement to assist with the winddown.) Those agreements included payment of a severance benefit calculated based upon the individual employee's years of service to the firm.

---

[1] BHB's former clients consist largely of insurance companies that have very detailed requirements that the firm must satisfy before bills are approved for payment. While the firm's collection rate is typically above ninety (90%) percent, the process often takes several months to complete.

The amount of the severance benefit and the manner of calculation was consistent with BHB's pre-existing policies, however, 50% of the total amount for severance was remitted to the employees in the first paychecks received in November 2025. In the aggregate, the total remaining due to the eight employees (including myself) assuming they fulfill the conditions of their agreements with the firm is $126,779.30. Prior to filing this case, BHB established a separate bank account at Columbia Bank and deposited said sum to be held in trust to ensure payment of the liabilities owed to the eight employees. In the event BHB pays these liabilities in the ordinary course, the funds deposited into this separate bank account will be available to pay BHB's general unsecured claims.

14. Following the dissolution vote on September 23, 2025, BHB continued to pay its ordinary trade debts, rent, remaining employee salaries, and obligations to its secured lender, Columbia Bank when due. The firm, however, ceased making certain payments owed to BHB former shareholders described below.

15. To become an equity shareholder, an individual was required to purchase share(s) in the firm for cash (generally, the amounts paid ranged from $75,000 to $100,000). When that individual ceased to be a shareholder, BHB was required to repurchase the share(s) and repay the purchase price for the share(s) in installments over a period of years ("Capital Repayment"). A number of Capital Repayment obligations were due to be paid to former shareholders on September 30, 2025. BHB did not make any of the Capital Repayment obligations due on September 30, 2025, or any that came due thereafter. Pursuant to the Amended and Restated Buy-Sell Agreement Bullivant Houser Bailey PC, October 23, 2017, and prior versions, as well, the payment default triggered a clause accelerating all amounts due.

//
//
//
//
//

**Reasons for Seeking Chapter 11 Protection**

16. As of November 1, 2025, BHB's assets and liabilities consisted of the following:

| *Assets* | | |
|---|---|---|
| Cash | | $666,027 |
| Accounts Receivable (at face value, incl. WIP) | | (est) $4,200,000 |
| Other personal property (at estimated fair liquidation value) | | (est) $30,000 |
| *Liabilities* | | |
| Columbia Bank (secured by substantially all assets of the firm) | Term Loan:<br>Letter of Credit Reim.:<br>Total: | $161,999<br>$215,493<br>$377,492 |
| Employee/benefits (potential "top heavy" 401(k) plan contribution obligation) | | (est) $50,000 |
| Tax liabilities | | $0 |
| Real Property Lessors (contingent claims for breach of lease liabilities based on 1 year of vacancy) | | (est) $1,750,000 |
| Other Trade Debts (current) | | (est) $ 450,000 |
| Malpractice/tort claims | | (est) $0 |
| Former Shareholders (Capital Repayment obligations triggered upon withdrawal from the firm) | | $1,636,322 |

17. Initially, the firm contemplated winding up its affairs under a provision of Oregon corporate law which, among other things, contemplates that a dissolving corporation give notice to creditors and provide creditors an opportunity to file claims for any debts owed to them within 120 days after the notice is served. *See* Oregon Revised Statutes ("ORS") §60.641. BHB met with its secured lender, Columbia Bank, and its three largest creditors – the landlords for the firm's offices in Seattle, Portland, and San Francisco who were expected to hold significant breach of lease claims – to explain the reasons for the dissolution and plans for the orderly winddown. Each of these creditors expressed support for the orderly winddown process out of

6

Case: 25-31017    Doc# 11    Filed: 12/15/25    Entered: 12/15/25 17:44:21    Page 6 of 14

court.  BHB also communicated to its former shareholders that it intended to proceed with a windup process under ORS §60.641.

18. The anticipated distribution plan under the ORS §60.641 dissolution would have distributed funds first to satisfy debts owing to creditors other than former shareholders, and only if funds remained after payment of those debts would money be distributed on a pro rata basis to former shareholders on account of their Capital Repayment claims.  Former shareholders were advised that in light of the September 23, 2025, dissolution, ORS §60.181(3) (which generally prohibits distributions to shareholders when a corporation is insolvent) could potentially bar the payments, but even if it did not, it was prudent to suspend Capital Repayments while BHB was seeking the cooperation of its major creditors in the out-of-court dissolution process.  Former shareholders were also advised that if BHB sought or was involuntarily placed into bankruptcy, their claims for Capital Repayment would be subordinated under Bankruptcy Code section 510(b).

19. Notwithstanding these communications, on November 11, 2025, one of BHB's former shareholders, Thomas Hutchinson, filed a civil action against the firm in Multnomah County Circuit Court seeking to recover what BHB owed him for Capital Repayment. *Hutchinson v. Bullivant Houser Bailey PC*, 25CV60392.

20. The filing of that case was reported in the local legal industry press shortly thereafter.  I became concerned that other former shareholders would be inclined to take similar legal action against BHB, not wanting Mr. Hutchinson to "jump ahead" of them in terms of the legal priority of this claim vis-à-vis their claims should he obtain and enforce a judgment.

21. Given the uncertainties relating to whether ORS §60.181 would act as a bar to further Capital Repayment distributions and/or whether Oregon dissolution law would allow for a distribution that that treated general creditor claims as having a higher priority than Capital Repayment claims absent unanimous consent, after conferring with counsel, I decided that the most efficient way to complete the winddown process and facilitate the distribution plan referenced in paragraph 18 was for BHB to file a Chapter 11 bankruptcy case and seek

confirmation of a plan of liquidation that *inter alia* subordinates claims of former shareholders for Capital Repayment under Bankruptcy Code section 510(b).

22. Immediately after this decision was made, we informed Columbia Bank and the three landlords about BHB's plans to seek Chapter 11 bankruptcy protection. I am advised that our counsel communicated with counsel to the three real property lessors of BHB intention to file its case in the Northern District of California, San Francisco Division, and that they did not object to proceeding in this venue.

23. Given that BHB had sufficient cash on hand, I decided that the firm should pay in full the $373,758.90 secured debt owed to Columbia Bank, which occurred prior to filing this case. (This was done to avoid post-bankruptcy interest and attorneys' fees that I am advised would be recoverable by Columbia Bank as an oversecured creditor. It also would avoid the cost of negotiating a cash collateral stipulation, motion to approve that stipulation, and attendant monitoring costs.)

24. BHB also circulated a draft Chapter 11 plan term sheet to its three landlord creditors on November 21, 2025. Based on comments received from their respective bankruptcy counsel, I anticipate that each of the lessors will support confirmation of BHB's proposed Chapter 11 plan of liquidation.

25. On December 9, 2025, counsel for Mr. Hutchinson offered to dismiss his civil action without prejudice in favor of proceeding with arbitration and inquired as to whether this would alter the decision to proceed with a Chapter 11 case. Our counsel responded the next day seeking clarification from Mr. Hutchinson concerning whether he would consent to subordination of his capital repayment claim if BHB returned to the dissolution process, but as of the execution of this declaration, we have received no response and based thereon conclude that Mr. Hutchinson does intend to enforce his claim by obtaining a judgment and judgment lien in order to obtain priority over other creditors.

26. BHB filed a voluntary Chapter 11 bankruptcy petition on December 15, 2025 (the "Petition Date") in the United States Bankruptcy Court for the Northen District of California, San Francisco Division ("Bankruptcy Court"). BHB continues to engage in an orderly

winddown of its business (primarily, collection of accounts receivable and facilitating transfer/disposition of client files) and is otherwise managing its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

27. As of the Petition Date, the Debtor had unencumbered operating funds deposited in its bank accounts of approximately $968,796.20, plus $126,779.30 in a separate account held in trust to pay the remaining obligations to key employees under their retention agreements discussed in paragraph 13. As of December 4, 2025, BHB held approximately $2.2 million in accounts receivable. Given the review process that most BHB clients employ, it can commonly take up to four (4) months after issuing an invoice to receive payment of that invoice. Historically, BHB's accounts receivable collection rate has exceeded 90%.

**Cash Management System**

*Collections and Disbursements from Operating Accounts*

28. In the ordinary course of its business, the BHB utilizes a cash management system that provides well-established processes for the collection and disbursement of funds generated by accounts receivable collections and used in its operations (the "Cash Management System"). The Cash Management System is a centralized process to accommodate BHB's clients and vendors. Maintenance of the existing cash management system is important to avoid confusion and disruption of the accounts receivable collection process for a number of reasons.

29. Payments received from clients and other sources of income are deposited into what we refer to as a concentration account no. ending in x3415 ("Concentration Account"). ACH/wire instructions tied to the Concentration Account are referenced on our firm's invoices. The firm's invoices also indicate how to make online credit card payments through a web portal. Consequently, clients with outstanding invoices are likely to pay those invoices by initiating ACH transfers, wires, or credit card payments that will be deposited directly into the Concentration Account.

30. Funds coming into the Concentration Account are transferred into an account ending in x3316 (the "Portland Operating Account") out of which the majority of the firm's obligations are paid. (The firms Seattle and San Francisco offices had maintained accounts at

Columbia Bank to cover miscellaneous office expenses). The firm also maintained a payroll account, and four client trust accounts. In November 2025, however, one of the firm's client trust accounts and one office account were closed.

31. The Operating Account is linked to various electronic fund transfer systems designed to efficiently pay the Debtor's monthly operating expenses, including payroll, insurance, rent, etc. across all its various offices. For instance, biweekly payroll is electronically debited by Debtor's payroll processing agent and thereafter distributed to the employees, 100 % of which is by direct deposit. Over the last 60 days, the Debtor has made on average approximately 60 ACH and check payments each month from its accounts at Columbia Bank (excluding payments from its payroll account and client trust accounts).

32. Each of these transactions are subject to various levels of authentication by the Debtor and Columbia Bank to prevent fraud and ensure timely and accurate payments. Maintenance of the Columbia Bank accounts and the Cash Management System will greatly facilitate the Debtor's operations during the pendency of this chapter 11 case. The continued maintenance of the Debtor's Bank Accounts is of paramount importance to the efficient collection of accounts receivable and effectuate payments to its vendors and employees. If the Columbia Bank accounts were closed, BHB would have to open new accounts and then attempt to arrange alternative electronic and manual payment procedures for payments out of the Debtor's accounts. BHB would also have to contact numerous clients to direct them not to pay those invoices by the ACH, wire, and credit card payment options specified on the invoices, but instead remit such payments through other means, which would disrupt the flow of post-petition receipts.

33. I am informed that Columbia Bank (fka Umpqua Bank) is a depository on the United States Trustee ("U.S. Trustee") Region 17 List of Authorized Depositories. On the day this case is filed, BHB will notify Columbia Bank of the filing of this case and direct it to stop payment on any outstanding checks issued prior to the filing of this case from the Portland Operating Account and remaining office account.

*Client Trust Accounts*

34. As noted, the firm maintained four (4) client trust accounts at Columbia Bank, one of which was closed in November 2025. In compliance with ethics rules for each of the states where Bullivant provided legal services, BHB has notified state bar associations of the institutions and account numbers where the trust accounts are maintained. All of the funds deposited into these accounts belong to the firm's clients, not the firm, and no funds belonging to the firm are comingled with funds in the client trust accounts. BHB may be entitled to payment from funds in the client trust accounts, but disbursements out of the client trust accounts are made only pursuant to the consent/instructions of a client.

35. As part of the winddown process, BHB is reviewing the funds on deposit in its three remaining client trust accounts and is arranging for return of funds to the clients entitled thereto. In my view, requiring BHB to close and reopen the three client trust accounts could unnecessarily delay the return of client funds and require additional needless reporting to state bar associations.

36. Moreover, I am advised that it is possible that checks issued from the client trust accounts to clients or as directed by a client prior to the filing of this case have not cleared. Again, because the funds in the client trust accounts are not BHB's property, BHB is requesting that in addition to requesting authorization to maintain the same three trust accounts, the Court authorize Columbia Bank to continue to honor checks presented for payment or other drafts against the trust accounts in the ordinary course and without regard to whether a check was issued prior to or after this case was filed.

*Corporate Credit Cards*

37. Columbia Bank has also issued three (3) corporate credit cards to the firm ("Credit Cards") with an aggregate credit limit of $10,000.00. The Debtor utilizes the Credit Cards primarily to pay miscellaneous business expenses incurred by its employees (e.g. travel expenses), and small operating expenses (e.g. office supplies). Pursuant to an agreement reached with Columbia Bank prior to filing this case, Columbia Bank is consenting to the firm's use of the three credit cards subject to the firm maintaining at least $10,000 in its accounts at Columbia

Bank, and BHB's consent to allow Columbia Bank to place an administrative hold on the amount of $10,000 in its accounts until the credit cards are cancelled and all charges are paid in full.

**Employees and Payroll**

38. BHB pays its employees bi-weekly. Each pay period ends at 11:59 p.m. on Saturday, and employees are paid the following Friday. In order to allow paychecks to be distributed or ECF payments made on time, the aggregate amount of wages and associated payroll taxes must be paid to BHB's payroll administrator no later than 4:00 p.m. on Wednesday following the pay period. The Debtor is requesting authority to make payment of the compensation earned during the period from Sunday December 7, 2025, through the Petition Date (the "Prepetition Wages") as part of its normal payroll cycle (which will cover pre- and post-petition periods). Accordingly, it is seeking authorization to disburse the total amount of the Prepetition Wages (currently estimated to be less than $18,000.00 for all eight remaining employees combined) to its third-party payroll service on or before 4:00 p.m. on Wednesday December 24, 2025. To protect employees' confidential information, BHB is not publicly disclosing the amounts due to each of the eight employees for pre-bankruptcy wages, but BHB is prepared to provide that information to the Court and the Office of the United States Trustee for its review.

39. In addition, the Debtor is also seeking authority to honor employee claims for vacation pay earned within the 180-days prior to the Petition Date by allowing employees to use accrued vacation post-petition, or to pay such vacation pay claims as may be required by law. (For example, under the California Labor Code, the amount owed to a separated employee for accrued and unused vacation must be paid in cash at the time his or her last paycheck is due.) No BHB employee is owed more than the statutory $17,150.00 cap provided for in Section 507(a)(4) of the Bankruptcy Code for unpaid Prepetition Wages and vacation pay.

40. The Debtor pays a portion of the premiums due for employee health, dental, vision, life, disability, and workers' compensation insurance plans (the "Benefits). The Debtor is seeking authorization to pay any and all prepetition amounts it may owe for contributions for such Benefits up to the amounts eligible for priority under 11 U.S.C. § 507(a)(5)(B).

41. In addition, the Debtor customarily reimburses its employees for business expenses incurred in performing their duties (the "Business Expenses"). The Debtor seeks authority to pay any prepetition Business Expenses and to honor outstanding checks related thereto. Reimbursable expenses are incurred on the Debtor's behalf and with the understanding that the employees will be timely reimbursed for all such amounts. If the Debtor is not granted authority to do so, the individual employees will bear the burden of paying the Debtor's expenses from their personal funds. This would be unjust to the employees and would only serve to lower employee morale at a time when the employees' best efforts are crucial to the Debtor and its estate.

42. In the ordinary course of business, the Debtor takes certain employee deductions from their employees' pay, including, *inter alia*: (a) employee contributions to health and insurance benefits; and (b) employee 401(k) contributions (together, the "Deductions"). The Debtor seeks authority to continue to make the Deductions forward Deductions to the applicable third-party recipients in the ordinary course of business.

43. The Debtor is also required by law to withhold from its employees' pay amounts related to, *inter alia*, federal, state and local income taxes and social security and Medicare taxes (the "Tax Withholdings"). The Debtor must match from its own funds for social security and Medicare taxes and pay additional amounts for state and federal unemployment insurance (together with the Tax Withholdings, the "Payroll Taxes"). The Debtor seeks authority from the Court to pay the Payroll Taxes, and to remit amounts withheld on behalf of third parties in the ordinary course, including amounts determined to be related to the period before the Petition Date.

44. I believe that its failure to make payment of the Prepetition Wages and the other employee obligations outlined above would create concern and discontent among BHB's remaining employees, adversely affect loyalty, and undermine the Debtor's' ability to retain its employees who are essential to the orderly winddown of the firm.

//

**Retention of Donlin Recano & Company**

45. BHB has entered into an agreement with Donlin Recano & Company ("DRC") to serve as claims and noticing agent in this case. I believe based on its experience in other Chapter 11 cases that DRC is well-qualified to perform the services described in the application to retain DRC as claims and noticing agent filed herewith.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct to the best of my knowledge and belief. Executed this 15th day of December 2025.

/s/Ronald L. Richman
Ronald L. Richman, Chief Dissolution Officer